IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 3:19-CV-226-RJC-DSC

| | |
|---|---|
| LISA CAROL RUDISILL,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br><br>Defendant. | DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS (Fed. R. Civ. P. 12(b)(1), 12(b)(6)) |

Defendant North Carolina State Board of Elections, by and through the undersigned counsel, respectfully submits this memorandum in support of its Motion to Dismiss, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

**Summary**

Plaintiff Lisa Carol Rudisill has filed a *pro se* complaint challenging the investigation by the North Carolina State Board of Elections (the "State Board") into an absentee ballot fraud scheme that supported the 2018 campaign of Mark Harris for North Carolina's Ninth Congressional District. That investigation resulted in the State Board's unanimous, bipartisan decision to order a new election for the Ninth District. *See Investigation of Election Irregularities Affecting Counties Within the 9th Congressional*

*District* at 2 (N.C. State Bd. of Elections March 13, 2019) (hereinafter "State Bd. Order") (attached as **Exhibit 1**).[1]

Plaintiff contends that the State Board violated her rights as a Ninth District voter by investigating the ballot fraud scheme and then ordering a new election. She seeks an injunction to prevent the new election from going forward. Her claims fail for a variety of reasons:

1. The Complaint names the State Board. As an agency of the State, however, the State Board is immune from suit in federal court under the Eleventh Amendment.
2. Plaintiff lacks standing to assert any of her claims, which may only be brought by the party injured by the State Board's investigation and decision—candidate Mark Harris.
3. The *Burford* abstention doctrine applies because the Complaint seeks to insert a federal court into a state's administrative proceedings.
4. The Complaint's factual allegations fail to state a plausible claim.

For these reasons, the Complaint should be dismissed with prejudice.

[1] The Court may consider the State Board's order and court filings attached to this Memorandum as exhibits, without converting the motion to dismiss into a motion for summary judgment, because these materials may be considered for the purposes of establishing whether the Court has jurisdiction under Rule 12(b)(1). *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). These materials may also be considered as part of Defendant's argument under Rule 12(b)(6), because the Court may take judicial notice of state court filings and the State Board's order, which are matters of public record, and because the Board's order for a new election is integral to the allegations in the Complaint and its authenticity is not reasonably subject to dispute. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Whittington v. N.C. Dep't of Juvenile & Delinquency Prevention*, No. CIV. 1:05CV348, 2006 WL 909141, at *1 (W.D.N.C. Apr. 7, 2006).

## Factual Background

In the weeks following the 2018 general election, the State Board declined to certify Republican candidate Mark Harris as the winner of the Ninth Congressional District election, despite initial election results indicating that Mr. Harris had received 905 more votes than his Democratic opponent, Dan McCready. State Bd. Order ¶¶ 2, 4. State Board investigators discovered "claims of numerous irregularities and concerted fraudulent activities related to absentee by-mail ballots" in the race. *Id.* ¶ 4. After the State Board afforded additional time for investigators to gather evidence, the Board conducted an evidentiary hearing on these issues between February 18 and February 21, 2019. *Id.* ¶ 16.

Before the hearing, candidate Harris brought a mandamus petition in Wake County Superior Court, seeking to stop the State Board's investigation and be certified as congressman-elect for the Ninth District. *Id.* ¶ 12. The court denied the petition, concluding that the State Board acted within its authority to delay certification of the election until the conclusion of the investigation and an evidentiary hearing on the matter. *Id.* ¶ 14; *see Harris v. N.C. Bipartisan State Bd. of Elections and Ethics Enforcement*, No. 19 CVS 25 (Wake Cty. Super. Ct. Jan. 25, 3019) (attached as **Exhibit 2**). Candidate Harris did not appeal that decision.

The State Board's evidentiary hearing revealed that during the 2018 election, campaign operatives working for candidate Harris conducted an absentee ballot scheme that involved numerous unlawful activities. State Bd. Order ¶ 24. That scheme involved (1) submitting absentee ballot request forms from voters, sometimes forging those forms

and submitting forms without a voter's knowledge or consent; (2) collecting voters' absentee ballots to submit to the county board of elections, which is illegal in most circumstances; (3) filling in vote selections on absentee ballots for races that the voter had not voted on; and (4) falsifying witness certifications on absentee ballots. *Id.* ¶¶ 36, 52, 54, 56, 59, 62–64, 71–74, 76–77. The Board found that candidate Mark Harris hired the individuals involved in this absentee ballot scheme, and he was warned that they were possibly engaged in unlawful ballot-collection activities. *Id.* ¶¶ 85–88.

The State Board also credited expert reports showing that (1) absentee ballot results were unexpectedly favorable for Mr. Harris in areas where the scheme operated, and (2) absentee ballots were requested and then not returned at unusually high rates in areas where the scheme operated. *Id.* ¶¶ 122–25.

Near the conclusion of the three-day hearing, candidate Harris himself concluded that a new election should be called, testifying as follows:

> Through the testimony I have listened to over the past three days, I believe a new election should be called. It has become clear to me that the public's confidence in the Ninth District seat [in the] general election has been undermined to an extent that a new election is warranted.

*Id.* ¶ 146.

After "conclud[ing] unanimously that irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness," the State Board ordered a new election pursuant to N.C. Gen. Stat. § 163A-1181(a)(4). *Id.* ¶ 153 & p. 45.

In the Complaint before this Court, Plaintiff argues that the State Board's actions were unlawful and that a new election should *not* be conducted for the Ninth Congressional District. Construing this *pro se* Complaint liberally, *see Ashby v. City of Charlotte*, 121 F. Supp. 3d 560, 562 (W.D.N.C. 2015), Plaintiff appears to assert three separate claims. *See* Compl. 6–7 (Doc. 3).[2]

First, Plaintiff alleges that the State Board "violated state elections law" by investigating the absentee ballot fraud scheme and ordering a new election without "sufficient proof" that the "'tainting' of the election would affect the outcome in terms of number of votes cast." *Id.* at 6; *see id.* at 2.

Second, Plaintiff appears to allege an equal protection claim, which may only be brought under 42 U.S.C. § 1983. *Id.* at 3, 6; *see Tommy Davis Const., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66 (4th Cir. 2015). She contends that during the 2016 governor's race, "such questions of voter manipulation were raised," but the State Board took no action in that instance. Compl. 6.[3] Plaintiff thus appears to be arguing that the State Board has discriminated against Republican candidates with respect to the investigation of election fraud.

---

[2] Since the Complaint does not include page numbers, pincites herein refer to the page numbers generated by the Court's docketing system.

[3] Plaintiff states, "I maintain that with another election (then incumbent Governor Pat McCrory vs current Governor Roy Cooper) in which such questions of voter manipulation were raised, questions were discounted by the state Board and new elections were NOT called for, making unfair and unequal treatment within this state and violating the voters right to fair elections in this state." Compl. 6.

Third, Plaintiff complains that the State Board's composition changed during the Ninth District investigation, "which 'taint[ed]' the outcome of the investigation." Compl. 6–7; *see id.* at 3. Specifically, new appointments were made from "the governor's political party." *Id.* at 6. The Governor is a Democrat and the Board's investigation centered on an absentee ballot program that supported the Republican candidate for Congress. *See* State Bd. Order ¶¶ 1, 33, 36, 151. Construed most liberally, this claim is perhaps a due process claim, which must be brought under § 1983. *See Tommy Davis Const.*, 807 F.3d at 66.

As a matter of public record, the Board was reconstituted after its previous composition had been declared invalid under the state constitution by a panel of three judges in Wake County Superior Court. *See Cooper v. Berger*, No. 18 CVS 3348, at 11–13 (Wake Cty. Super. Ct. Oct. 16, 2018) (attached as **Exhibit 3**). Thereafter, the North Carolina General Assembly enacted a new law that required the Governor to make new appointments to the Board. *See* N.C. Sess. Law 2018-146, sec. 3.2.(a) (enacted December 27, 2018) (attached as **Exhibit 4**).

**Dismissal Standards**

Under a Rule 12(b)(1) motion to dismiss, the burden of proving subject matter jurisdiction is on the party asserting jurisdiction. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A motion to dismiss based on Eleventh Amendment immunity poses a question of the Court's jurisdiction to hear the case. *See Martin v. Wood*, 772 F.3d 192, 195 & n.* (4th Cir. 2014). Whether a plaintiff has standing is also matter of the court's jurisdiction, *see Disabled Patriots of Am., Inc. v. Fu*, No. 3:08CV542-RJC-

DSC, 2009 WL 1470687, at *2 (W.D.N.C. May 26, 2009), as is the question of *Burford* abstention, *see Johnson v. Collins Entm't Co.*, 199 F.3d 710, 719 (4th Cir. 1999).

A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and satisfy the court that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

## Argument

### A. The Eleventh Amendment Bars This Federal Complaint Against the State Board.

The Eleventh Amendment bars an individual from suing a nonconsenting state in federal court. *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001). This immunity is absolute and bars suits against a state regardless of the relief sought, and it applies to a state's "agencies or departments." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). "It is undisputed that the State Board functions as a quintessential 'arm of the State,'" and "[a] suit against the State Board is therefore functionally equivalent to a suit against the state of North Carolina." *Walker v. N.C. State Bd. of Elections*, No. 1:17-CV-78, 2017 WL 4477295, at *1 (M.D.N.C. May 15, 2017).

A state's Eleventh Amendment immunity gives way in only two situations: (1) where Congress has expressly and validly abrogated the immunity, and (2) where a state

has explicitly waived its immunity. *Johnson v. North Carolina*, 905 F. Supp. 2d 712, 723 (W.D.N.C. 2012). Neither situation applies here.

Plaintiff has not pleaded any congressional abrogation of North Carolina's immunity with respect to claims regarding compliance with the state's election laws, even assuming such abrogation claims were even possible. *See Pennhurst*, 465 U.S. at 117 ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment . . . ."); *Hill v. McCrory*, No. 116CV00259MOCDLH, 2016 WL 5890067, at *3 (W.D.N.C. Oct. 7, 2016) (dismissing another state law claim against the State Board pursuant to Eleventh Amendment immunity). Additionally, Congress has not abrogated state immunity with respect to claims under 42 U.S.C § 1983. *See In re Sec'y of Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993).

Similarly, Plaintiff has not pleaded a waiver by North Carolina of its immunity with respect to any of the claims, nor could she. Such a waiver would have to be explicit and unequivocal—for example, a clear waiver statement in state statutes or the state constitution. *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1138 (4th Cir. 1990). Plaintiff can point to no law that waives the State's immunity to suit in federal court over her claims.

Because Plaintiff has failed to plead a waiver or abrogation of the State Board's Eleventh Amendment immunity, the Complaint should be dismissed under Rule 12(b)(1). *See Walton v. N.C. Dep't of Commerce*, No. 1:17-CV-00054-MR-DLH, 2018 WL 1368364, at *6 (W.D.N.C. Mar. 16, 2018), *aff'd*, 732 F. App'x 239 (4th Cir. 2018); *Johnson*, 905 F. Supp. 2d at 723; *Walker*, 2017 WL 4477295, at *1.

## B. Plaintiff Lacks Standing.

Jurisdiction over the Complaint is lacking for another reason: Plaintiff does not have standing to seek relief, as a voter, for an injury that only the affected candidate may attempt to remedy.

"To invoke federal jurisdiction, a plaintiff bears the burden of establishing" the three elements of standing required by Article III of the U.S. Constitution. *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017). These elements are:

> (1) an injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* (quoting *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013)).

"It is well settled that under Article III of the United States Constitution, a plaintiff must establish that a 'case or controversy' exists 'between himself and the defendant' and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" *Smith v. Frye*, 488 F.3d 263 (4th Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

Pursuant to this rule, a voter does not have standing to "assert the rights of third-party elected officials or 'voters' generally." *Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599, 610 (D. Md. 2016), *aff'd*, 685 F. App'x 261 (4th Cir. 2017). Stated differently, "a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared or is only derivative of a harm experienced by a candidate." *Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) (per curiam).

In *Dyer*, the District of Maryland rejected a plaintiff's argument that he had standing on behalf of voters on the theory that the removal of a public official "constitutes a nullification of a properly conducted election." 187 F. Supp. 3d at 610. Plaintiff's theory in this case is analogous—she contends that the State Board's actions "violate[d] [her] rights as a district voter by overturning [the Ninth District] election." Compl. 3. She contends that the Board should not have investigated the Harris campaign and should not have ordered a new election. *Id.* at 6. She contends further that Mr. Harris was treated differently than a Democratic candidate in a previous election. *Id.* Finally, she alleges that the State Board's composition "cause[d] substantial and unfair effects in the resulting investigation of Mark Harris." *Id.* at 7. Similar to the complaint in *Dyer*, these allegations amount to generalized grievances that may be shared by many voters who supported candidate Harris. The Complaint's allegations are therefore insufficient to establish Article III standing.

The State Board's investigation of candidate Harris's campaign, the refusal to certify Mr. Harris as the winner, and the decision to order a new election are, if anything, injuries for which only Mr. Harris could seek redress. Plaintiff does not purport to assert third-party standing on behalf of Mr. Harris's injuries. Nevertheless, to do so, Plaintiff would have to show that: (1) she has a close relationship with Mr. Harris, and (2) there is some hindrance to Mr. Harris's ability to assert his own rights. *See Stuart v. Loomis*, 992 F. Supp. 2d 585, 610 (M.D.N.C.), *aff'd sub nom. Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014). Plaintiff alleges no relationship to Mr. Harris; but even if she did, she could not allege that Mr. Harris lacked the ability to protect his own interests. After all, Mr.

Harris brought suit in Wake County Superior Court—albeit unsuccessfully—to stop the State Board's investigation and to compel the State Board to certify his election. *See* Ex. 2. He did not appeal that decision. Candidate Harris also defended his campaign, through counsel, at the State Board's evidentiary hearing. State Bd. Order 1. After hearing the evidence, Mr. Harris even admitted that a new election was appropriate. *See id.* ¶ 146. Plaintiff may not now attempt to secure the remedy for Mr. Harris that Mr. Harris has abandoned.

Because Plaintiff's alleged harm is a generalized grievance and because she cannot meet the standard to assert a claim on behalf of a third party (candidate Harris), the Complaint should be dismissed for lack of standing.

### C. The Court Should Decline to Exercise Jurisdiction Under the *Burford* Abstention Doctrine.

As an alternative grounds for dismissal, the *Burford* abstention doctrine applies to this case because adjudicating the Complaint would insert the Court into the State's administrative system of investigating and hearing claims of election improprieties—an administrative system that has an adequate review mechanism through North Carolina state courts.

Under *Burford*, "when adequate state court review is available, a federal court sitting in equity should abstain from reviewing cases involving difficult questions of state law or a state's administration of its own regulatory schemes." *King v. Jefferies*, 402 F. Supp. 2d 624, 635 (M.D.N.C. 2005). When the relief sought is equitable in nature, the

Court may dismiss the case under the *Burford* doctrine, rather than issuing a stay of proceedings. *Id.* at 635–36.

As a threshold matter, the Court must determine whether adequate state court review is available for Plaintiff's claims. *Id.* at 518. North Carolina law provides adequate review of decisions of the State Board of Elections, including decisions to order a new election. Any "aggrieved party" has a "right to appeal the final decision" of the State Board to Wake County Superior Court. N.C. Gen. Stat. § 163A-1183(b). The law further makes clear that "[a] decision to order a new election is considered a final decision for purposes of seeking review of the decision." *Id.* § 163A-1183(a). An adverse decision in state superior court can be appealed as of right to the North Carolina Court of Appeals. *See id.* § 7A-27(b)(1); *e.g.*, *Appeal of Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 264 S.E.2d 338 (1980). Further, the North Carolina Supreme Court may elect to hear appeals from the State Board's election decisions. *See* N.C. Gen. Stat. § 7A-31; *e.g.*, *James v. Bartlett*, 359 N.C. 260, 265, 607 S.E.2d 638, 641 (2005). Indeed, under certain limited circumstances, the North Carolina Supreme Court *must* review decisions by the Court of Appeals. *See* N.C. Gen. Stat. § 7A-30. The law therefore provides adequate judicial review of decisions by the State Board.[4]

[4] Under North Carolina law, moreover, "any registered voter who was eligible to vote" in a particular election may pursue a "protest concerning the conduct of [that] election." N.C. Gen. Stat. § 163A-1177(a). That protest will be heard by the relevant county board of elections and may be appealed to the State Board. *See id.*; *id.* § 163A-1179. Thus, state law provides a thoroughgoing administrative remedy for Plaintiff's very claims. The methods of appealing a State Board's decision that are described above would likewise apply to an election protest filed by a voter. *See id.* § 163A-1183.

Under *Burford*, once a court determines adequate judicial review is available, the court must "determine whether either: 1) difficult questions of state law exist which affect policy problems of substantial public import; or 2) federal review would disrupt state efforts to establish a coherent policy in an area of public interest." *Prentiss*, 87 F. Supp. 2d at 519 (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)).

Here, adjudicating this case in a federal forum would disrupt the State of North Carolina's efforts to establish a coherent policy with respect to the standards for calling for a new election. Plaintiff's claims would also require this Court to interpret state law to adjudicate her federal claims.

North Carolina law authorizes the State Board to decline to certify an election and order a new election in four situations:

> (1) Ineligible voters sufficient in number to change the outcome of the election were allowed to vote in the election, and it is not possible from examination of the official ballots to determine how those ineligible voters voted and to correct the totals.
>
> (2) Eligible voters sufficient in number to change the outcome of the election were improperly prevented from voting.
>
> (3) Other irregularities affected a sufficient number of votes to change the outcome of the election.
>
> (4) Irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness.

N.C. Gen. Stat. § 163A-1181(a).

In the first three scenarios, the Board must find that improprieties that occurred in an election must have affected enough votes "to change the outcome of the election." *Id.*

However, in the fourth scenario, the law authorizes the State Board to order a new election *without* making a conclusive finding that the improprieties changed the outcome of the election. *Id.* § 163A-1181(a)(4). Instead, in the Board's estimation, any "[i]rregularities or improprieties" must have been so extensive "that they taint the results of the entire election and cast doubt on its fairness." *Id.*

Under North Carolina law, therefore, it is the State Board's role to draw conclusions about whether any particular case of election malfeasance rises to the level of tainting the entire election and casting doubt on its fairness such that a new election should be ordered. If a party disagrees with the State Board's conclusions about whether this standard has been reached, that party may take their case on appeal to the North Carolina courts, which are best equipped to interpret North Carolina's laws on election administration. *See* N.C. Gen. Stat. § 163A-1183(b). Moreover, North Carolina law grants the State Board the sole discretion to determine when it is "necessary or advisable" to investigate "frauds or irregularities in elections . . . ." *Id.* § 163A-741(d); *see also id.* § 163A-4 (describing Board's powers to issue subpoenas, summon witness, and otherwise gather evidence in the service of its investigations).

This suit therefore invites a federal court to draw conclusions about the State Board's proper application of state statutes enforced by the State Board. This case would unnecessarily insert this Court into "difficult questions of state law" that "affect policy problems of substantial public import"—namely, when to initiate an investigation based on information of election improprieties, and when to order a new election when it is difficult to determine the precise number of votes affected by such improprieties.

*Prentiss*, 87 F. Supp. 2d at 519. This case would also "disrupt state efforts to establish a coherent policy in [this] area of public interest." *Id.* And it would ask this Court to make determinations where the state courts had not been given a chance to review the state agency's application of state law. *See N.C. Life & Acc. & Health Ins. Guar. Ass'n v. Alcatel*, 876 F. Supp. 748, 753 (E.D.N.C.), *aff'd*, 72 F.3d 127 (4th Cir. 1995) (abstaining because neither the North Carolina Department of Insurance nor the state's courts had had an opportunity to interpret statutes at issue). As the Supreme Court has recognized in another federalism-related context, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106 (applying Eleventh Amendment immunity).

The Fourth Circuit has routinely applied *Burford* to situations, like this one, where federal claims are actually "state law in federal clothing." *Johnson*, 199 F.3d at 721 (citation omitted); *see Browning-Ferris v. Baltimore County*, 774 F.2d 77, 79–80 (4th Cir. 1985) (abstention appropriate where federal claims under § 1983 involved questions of state and local land-use policy); *Caleb Stowe Assocs. v. County of Albemarle*, 724 F.2d 1079, 1080 (4th Cir. 1984) (abstention appropriate where § 1983 claims depended on construction of state law). Here, Plaintiff's claims are grounded in the Board's construction and application of state law. As discussed above, the Board's discretion to investigate improprieties in elections is a matter of state law. *See* N.C. Gen. Stat. § 163A-741(d). Similarly, the standard governing the Board's decision to order a new election is prescribed in state law. *See id.* § 163A-1181(a). And the manner by which the

Board's membership is composed is set out in state law. *See* Ex. 4. Plaintiff admits as much when she alleges that the Board's "actions violated state elections law." Compl. 6. Accordingly, to the extent any federal claims are alleged in the Complaint, they are effectively grounded in Plaintiff's disagreement with the Board's application of state law. In such cases, the Fourth Circuit has "consistently found" that *Burford* abstention is appropriate. *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 282 (4th Cir. 2008).

Other courts have found *Burford* abstention to be appropriate in the context of a state's application of its election rules. In *Seider v. Hutchison*, No. 3:06CV215, 2007 WL 320964 (E.D. Tenn. Jan. 30, 2007), the district court declined jurisdiction under *Burford* when a losing candidate for sheriff in a Tennessee county asked the federal court to enjoin the county's plans to appoint a sheriff after the state's courts had declared the results of an election to be invalid. *Id.* at *1–2. The plaintiff wanted the federal court to order a new election, but state law required the sheriff to be appointed after the results were declared invalid. *Id.* at *2. The court determined that its intervention would create "needless conflict with the administration by a state of its own affairs," and that issues of state law predominated in the case. *Id.* at *2–3. On appeal, the Sixth Circuit reversed, but only because the district court should have stayed the case under *Burford*, rather than dismissing. *Seider v. Hutchison*, 296 F. App'x 517, 518 (6th Cir. 2008). In that case—unlike here—plaintiff had made claims for money damages, which prevents dismissal under *Burford*. *Id.* The Sixth Circuit therefore agreed that the decision to abstain under *Burford* abstention was appropriate; it simply disagreed with the form that abstention took in that case.

Similarly, here, this Court's intervention into the State Board's conduct of a new election in the Ninth District would create "needless conflict with the administration by a state of its own affairs" and would require the Court to delve into the proper application of state election law. *Seider*, 2007 WL 320964, at *2. And because there are no monetary damages claimed in the Complaint, *see* Compl. 5, 7, dismissal under *Burford* is appropriate, rather than a stay. *See King*, 402 F. Supp. 2d at 635–36.

**D. The Complaint Fails to State a Plausible Claim for Relief.**

Finally, the Complaint fails to state a plausible claim for relief.

Although a *pro se* Complaint must be construed liberally, Plaintiff "must still plead 'more than labels and conclusions.'" *Ashby*, 121 F. Supp. 3d at 562 (quoting *Giarratano v. Johnson*, 521 F.3d 298, 304 n. 5 (4th Cir.2008)). A *pro se* plaintiff, like any other plaintiff, "has the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* (quoting *Godfrey v. Long*, No. 5:10–CT–3105–BO, 2012 WL 43593, at *1 (E.D.N.C. Jan. 9, 2012)).

Plaintiff's first claim asserts that the State Board "violated state elections law," because it investigated the absentee ballot scheme in the Ninth District and ordered a new election without "sufficient proof" that the "'tainting' of the election would affect the outcome in terms of number of votes cast." Compl. 6; *see id.* at 2. However, the State Board ordered a new election under N.C. Gen. Stat. § 163A-1181(a)(4). *See* State Bd. Order 2 & ¶ 145, 150, 152–53. This provision does *not* require a conclusive finding that the improprieties in the election affected a sufficient number of votes to change the outcome of the election—unlike the separate grounds for ordering a new election under

N.C. Gen. Stat. § 163A-1181(a)(1) through (3). The North Carolina Court of Appeals rejected a similar argument in *Appeal of Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 574, 264 S.E.2d 338, 347 (1980), and affirmed the State Board's order for a new election, even though "there [wa]s no showing that the violations contained in the findings of fact were sufficient to change the outcome of the election," *id.* at 573, 264 S.E.2d at 348. Plaintiff's first claim is therefore based on a misunderstanding of state law and fails to state a legal claim.

Plaintiff's second claim fares no better. She alleges that the State Board did not investigate "such questions of voter manipulation" that were raised in the 2016 governor's race, which the Democratic candidate won. Compl. 6. On its face, these allegations are insufficient to state a claim that the State Board was discriminating against Republican candidates. The bare assertion that there were "such questions of voter manipulation" provides insufficient factual detail about the events in 2016 to make it plausible that the scenarios in the two elections were sufficiently similar to conclude that candidate Harris was unlawfully discriminated against. The Complaint does not come close to suggesting that there was evidence in 2016 of a coordinated scheme by Democratic campaign operatives to submit forged absentee request forms, illegally harvest absentee ballots from voters, fill in ballot selections were voters had declined to vote on certain races, or falsify witness certifications. In the absence of such allegations demonstrating that the situations facing the State Board in 2016 and 2018 were sufficiently similar, the Complaint fails to state an equal protection claim. *See, e.g.*, *Painter v. Doe*, No. 315CV00369MOCDCK, 2016 WL 4644495, at *5 (W.D.N.C. Sept.

6, 2016); *Hine v. Samuels*, No. 5:15-CT-3126-D, 2015 WL 12916312, at *2 (E.D.N.C. Dec. 22, 2015).

Finally, Plaintiff's third claim for a due process violation is also implausible. Plaintiff contends that new appointments made to the State Board during its investigation into the Ninth District "tainted" its outcome and were unfair because the Governor made those appointments. Compl. 6. This does not state a due process claim for three reasons.

First, "administrative decision makers, like judicial ones, are entitled to a presumption of honesty and integrity," and their decisions cannot be disturbed on allegations of unconstitutional bias "absent a showing of bias stemming from an extra-judicial source." *Bradley v. Colonial Mental Health & Retardation Servs. Bd.*, 856 F.2d 703, 710 (4th Cir. 1988) (quoting *Morris v. City of Danville, Va.*, 744 F.2d 1041, 1044 (4th Cir. 1984)). Plaintiff has made no allegations of bias that could plausibly overcome the presumption of the Board's integrity and fairness. Merely identifying the Board members as gubernatorial appointees does not create a plausible inference that they are too biased to adjudicate cases of election fraud fairly.

Second, the factual background of the Board appointments further makes the claim of unconstitutional bias implausible. The composition of the Board changed during the Ninth District investigation because a North Carolina court determined that the previous law governing appointments to the Board was invalid for violating the state constitution's separation-of-powers provision. *See* Ex. 3 at 13. The previous law was invalid precisely because it failed to give the Governor sufficient control over appointments to the Board. *Id.* at 11–13. In response, the Republican-controlled North Carolina General Assembly

enacted the law that granted the Democratic Governor the right to make the appointments that the Plaintiff now complains of. *See* Ex. 4. Under the law, the Governor may appoint three Board members from a list generated by his own political party, and he may appoint two members from a list generated by the opposing party. *See id.*, sec. 3.2.(a), § 163-19(b). Against this backdrop, in which a court and the North Carolina legislature compelled the Governor to make new appointments to the Board, these new appointments cannot be said to have generated unfair bias.

Third, the bipartisan nature of the Board's decisions with respect to the Ninth District investigation defeat any inference of bias. When the Board was composed of four Democratic appointees, four Republican appointees, and an unaffiliated appointee, *see* Ex. 3 ¶ 10, the Board voted unanimously not to certify the Ninth District election and to provide additional time to investigate. *See* State Bd. Order ¶ 4. Then the Board voted 7–2 in favor of holding an evidentiary hearing and further delaying certification. *Id.* Finally, when the Board was re-constituted with three Democratic appointees and two Republican appointees, it voted unanimously to order a new election after hearing the evidence. *See* State Bd. Order 2. The claim of unconstitutional bias is therefore implausible.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant its Motion to Dismiss the Complaint in its entirety. Because of the numerous independent grounds for dismissal, amendment of the Complaint would be futile. Defendant therefore requests dismissal with prejudice.

This the 7th day of June, 2019.

JOSHUA H. STEIN
Attorney General

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General
N.C. State Bar No. 49146
Email: pcox@ncdoj.gov
N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
Telephone: (919)716-6900

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS with the Clerk of Court using the CM/ECF system and have placed a copy in the U.S. Mail, postage prepaid, to the plaintiff who is a non-CM/ECF user, as follows:

Lisa Carol Rudisill
7101 Londontowne Dr.
Charlotte NC 28226
godslisaru@aol.com

This the 7th day of June, 2019.

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General