# EXHIBIT 1

**EXHIBIT 1**

STATE OF NORTH CAROLINA

COUNTY OF WAKE

BEFORE THE
STATE BOARD OF ELECTIONS

*IN THE MATTER OF:*                )
INVESTIGATION OF                )
ELECTION IRREGULARITIES      )
AFFECTING COUNTIES            )        **ORDER**
WITHIN THE 9TH                    )
CONGRESSIONAL DISTRICT      )

THIS MATTER CAME BEFORE THE STATE BOARD OF ELECTIONS ("State Board") upon the State Board's own motion at a public evidentiary hearing held February 18, 2019 through February 21, 2019 in the manner prescribed by a Notice of Hearing and Amended Order of Proceedings issued February 4, 2019.  At the evidentiary hearing, congressional candidate Jeff Scott appeared *pro se*; congressional candidate Dan McCready appeared through counsel,  Marc E. Elias (admitted *pro hac vice*), Jonathan Berkon (admitted *pro hac vice*), and John R. Wallace; congressional candidate Dr. Mark E. Harris appeared and was represented by counsel David B. Freedman, Dudley A. Witt, Alex C. Dale, and Christopher S. Edwards; judicial candidate Vanessa Burton appeared and was represented by Sabra J. Faires and William R. Gilkeson, Jr.; and judicial candidate Jack Moody appeared and was represented by Timothy R. Haga.  The Mark Harris for Congress Committee was represented by John E. Branch, III.  Additional candidates were provided notice of the evidentiary hearing, but did not appear.

After receiving testimony and other evidence submitted over a four-day hearing, and after reviewing written submissions and hearing arguments from the parties, and having weighted the representations of agency staff, the State Board finds, concludes and orders the following:

EXHIBIT 1

# I. INTRODUCTION

A new election is the gravest remedy available to this State agency that has, for a century, supervised elections meant to ensure "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. CONST. art. I, § 2.

And yet, the substantial record before the State Board of Elections in this case lead this Board to unanimously conclude that the 2018 General Election for North Carolina's 9th Congressional District was corrupted by fraud, improprieties, and irregularities so pervasive that its results are tainted as the fruit of an operation manifestly unfair to the voters and corrosive to our system of representative government. A new election is necessary not only in the congressional contest, but also in two local contests caught in the long shadow of uncertainty caused by absentee ballot fraud funded principally by the Mark Harris for Congress Committee. Tampering, obstruction and disguise have obscured the precise number of votes either unlawfully counted or excluded, but substantial evidence supports our conclusion that the absentee ballot scheme and other irregularities cast doubt on the outcome of each contest subject to this Order.

**EXHIBIT 1**

## II.    PROCEDURAL HISTORY

1.    In the November 6, 2018 General Election, North Carolina's Ninth Congressional District ("CD-9") spanned eight counties along the State's central southern border.   Moving west to east, CD-9 included a portion of Mecklenburg County; all of Union, Anson, Richmond, Scotland, and Robeson Counties; and substantial parts of Cumberland and Bladen Counties. In that election, the candidates seeking to represent CD-9 in the 116th Congress were Republican nominee Mark Harris, Democratic nominee Dan McCready, and Libertarian nominee Jeff Scott.

2.    After counties canvassed the votes, Harris led McCready by an apparent margin of 905 votes, which constituted slightly more than one-quarter of one percent of all ballots tallied in that contest.

3.    The number of returned absentee by mail ballots far exceeded the margin between Harris and McCready, with more 10,500 tallied districtwide.

4.    On November 27, 2018, the date designated by statute for canvass of federal, judicial and multicounty contests, the State Board of Elections and Ethics Enforcement unanimously declined to canvass the 2018 General Election for CD-9 after a briefing from agency investigators and counsel in closed session.  The State Board of Elections and Ethics Enforcement — the predecessor to the present State Board of Elections — recessed its canvass

**EXHIBIT 1**

meeting for three days to allow agency staff time to review investigatory information. Following additional briefings from agency investigators and staff, that Board on November 30, 2018, again declined to canvass results for CD-9, citing "claims of numerous irregularities and concerted fraudulent activities related to absentee by-mail ballots and potentially other matters in Congressional District 9." The Board voted 7-2 to hold an evidentiary hearing "pursuant to its authority under G.S. §§ 163A-1180 and 163A-1181 to assure that the election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election" and to stay the issuance of certificates of elections in three other contests in which the apparent outcome could have been reversed by returned or non-returned absentee by mail ballots in Bladen and Robeson counties: Seat 2 on the District Court in Judicial District 16B, Bladen County Commissioner District 3, and Bladen Soil and Water Conservation District Supervisor.

5. On December 1, 2018, the Board, through Chair J. Anthony Penry, issued subpoenas to various entities, including the Mark Harris for Congress Committee ("Harris Committee"). After Mr. Penry resigned, Governor Roy Cooper appointed Joshua D. Malcolm as Chair on December 3, 2018.

6. On December 3, 2018, noting the compelling need for public disclosure in the stay of certification, Chair Malcolm instructed the State Board's executive director to "undertake a review of materials that may be

4

**EXHIBIT 1**

produced on a rolling basis in a manner reasonably calculated to serve the public interest without compromising the investigation." The State Board began posting materials through a website portal that provided public access to thousands of pages of evidentiary documents, investigative reports, and election records, including a substantial number of records regarding alleged absentee ballot fraud in Bladen County referred to state and federal prosecutors after the 2016 General Election. The referral was made by the State Board at a public hearing in December 2016 subsequent to a staff investigation.

7. On December 17, 2018, Chair Malcolm issued an Order of Proceedings that prescribed procedures for the evidentiary hearing, established a briefing schedule, and noticed a hearing date of January 11, 2019, among other things.

8. In the fall of 2018, a three-judge panel of the Superior Court of Wake County held that creating the State Board of Elections and Ethics Enforcement violated the constitutional separation of powers, but acted on December 11, 2018, to allow that Board to remain in place until noon on December 28, 2018. *See* Order Extending Stay, *Cooper v. Berger et al.*, 18 CVS 3348 (N.C. Super. Ct. Wake County, December 11, 2018).

9. On December 27, 2018, the General Assembly enacted Session Law 2018-146, establishing a State Board of Elections composed of five

**EXHIBIT 1**

gubernatorial appointees. The enactment included a provision directing that the new State Board would be appointed effective January 31, 2019.

10. At noon on December 28, 2018, the State Board of Elections and Ethics Enforcement was dissolved by Court order, and Governor Cooper transmitted a letter to chairs of the North Carolina Democratic Party and the Republican Party of North Carolina requesting their recommendations for interim members to avoid a month in which the Board would lack seated members. *See* Letter from the Office of the Governor to State Democratic Party Chair Wayne Goodwin and State Republican Party Chair Robin Hayes (Dec. 28, 2019). Appointment of an interim State Board would have allowed for the evidentiary hearing to proceed as scheduled on January 11, 2019.

11. On December 30, 2019, however, the State Republican Party notified the Governor of its intent to initiate legal action to block any interim appointments made to the State Board, contending that the Board must remain vacant until January 31, 2019. *See* Letter from John M. Lewis, State Republican Party's General Counsel, to William C. McKinney, Office of the Governor's General Counsel (Dec. 30, 2019).

12. On January 3, 2019, citing the absence of a seated State Board, candidate Mark Harris initiated legal proceedings to compel the issuance of a certificate of election. *See* Petition for Writ of Mandamus and Appeal from the Failure of the State Board to Act, *Harris v. Bipartisan State Board of Elections*

**EXHIBIT 1**

*and Ethics Enforcement*, 19 CVS 0025 (N.C. Super. Ct. Wake County).

13.     On January 11, 2019, the United States House of Representatives' Committee on House Administration, by and through its Chair, Zoe Lofgren, transmitted a letter to the State Board's executive director, stressing the Committee's duty under Clause 1(k) of House Rule X to review the election returns and qualification of each member and specifying that a state's "certificate is not ultimately determinative of the House's course of action as . . . the final arbiter of who is the rightful claimant to its seats." *See* Letter from Rep. Zoe Lofgren, Chair of the Committee on House Administration, to Kim Westbrook Strach, Executive Director of the State Board of Elections (Jan. 11, 2019).

14.     On January 22, 2019, Senior Resident Superior Court Judge Paul C. Ridgeway held a hearing on the Petition for Mandamus and the Appeal in *Harris*.   Following arguments by the parties, Judge Ridgeway ruled in open court that the State Board of Elections and Ethics Enforcement possessed statutory authority to initiate proceedings necessary to ensure the election was without fraud or corruption; that the Board had acted within its lawful authority to delay certification during the pendency of those proceedings; and that Harris had failed to establish any clear legal right to certification before the Board concluded its review.  The Court, therefore, denied the Petition and the Appeal. *See* Order, *Harris*, 19 CVS 0025 (N.C. Super. Ct. Wake County,

7

EXHIBIT 1

January 25, 2019).

15.    On January 31, 2019, Governor Cooper appointed all members of the new State Board of Elections, who held an organizational meeting that afternoon to select Robert B. Cordle to serve as Chair and Dr. Stella E. Anderson to serve as Secretary.

16.    On February 4, 2019, Chair Cordle issued a Notice of Hearing and Amended Order of Proceedings that prescribed the procedures and evidentiary standards that would govern the hearing announced for February 18, 2019. The Order also established a process by which affected candidates could request to compel the attendance of individuals who they may wish to call as witnesses. On February 8, 2019, Chair Cordle granted all requests for witness subpoenas and issued additional investigative subpoenas to a selection of entities, including the Harris Committee, requiring productions identical to those required under subpoenas issued by the predecessor State Board of Elections and Ethics Enforcement.

17.    The Board held a public evidentiary hearing between February 18 and February 21, 2019, in the courtroom of the North Carolina State Bar in Raleigh.

18.    At the end of the hearing, the Board voted unanimously to order a new election for CD-9, Bladen County Commissioner District 3, and Bladen Soil and Water Conservation District Supervisor. The Board continued its

8

**EXHIBIT 1**

hearing as to Seat 2 on the District Court in Judicial District 16B to allow agency staff additional time to review a number of factors distinctively relevant to that contest, and a separate Order will be entered as to that matter. The Board further allowed affected candidates to submit proposed findings of fact and conclusions of law by February 27, 2019.

## II.    FINDINGS OF FACT

**A.    In the months after the State Board declined to certify a winner in the contest for CD-9, and before the Board held its evidentiary hearing, the Board staff conducted a investigation into the irregularities and improprieties affecting elections in certain counties within that congressional district.**

19.    The Board employs an executive director, in-house investigations team, data analysts, and counsel who carry out the work of Board investigations. During their investigation into election irregularities affecting counties within CD-9, Board staff uncovered overwhelming evidence that a coordinated, unlawful, and substantially resourced absentee ballot scheme operated during the 2018 General Election in Bladen and Robeson Counties.

20.    In the absence of seated Board members, between December 28, 2018, and January 31, 2019, agency staff continued their collection and review of communications, financial records, and other documents produced under more than a dozen subpoenas.

21.    As part of the Board staff's thorough review, Board investigators attempted to interview 401 voters, successfully interviewed 142 voters, and

9

**EXHIBIT 1**

also interviewed 30 subjects and other witnesses.

22.     Subpoenas issued by the predecessor Board and by the present State Board yielded records in excess of one hundred thousand pages, including communications, financial information and phone records.

23.     Three distinct categories of irregularities occurred in Bladen and Robeson Counties during the 2018 General Election: (1) absentee by mail irregularities in Bladen and Robeson Counties; (2) disclosure of early voting results in Bladen County; and (3)  a lack of office security in the Bladen County Board of Elections Office ("Bladen CBE").

24.     The absentee by mail irregularities were enabled by a well-funded and highly organized criminal operation, coordinated by Leslie McCrae Dowless Jr. and others, and funded principally by the Harris Committee through its consulting firm Red Dome Group. Bladen County Sheriff James McVicker and other candidates also paid Dowless.

**B.     The number of absentee ballots in some manner affected by the operation run by Dowless, exceeded the apparent margin between Harris and McCready based on unofficial results.**

25.     After the 2018 General Election, districtwide, the apparent results of CD-9 were as follows: Harris 139,246, McCready 138,341, and Scott 5,130. Accordingly, Harris led by a margin of 905 votes, or 0.3% of the total number of votes tallied.

**EXHIBIT 1**

26. Districtwide, the apparent absentee by mail votes were as follows: Harris 4,027, McCready 6,471, and Scott 153.

27. In Bladen County, where Dowless and his workers were found to have concentrated their activity, the apparent absentee by mail votes were as follows: Harris 420, McCready 258 , and Scott 6.

28. In Robeson County, where Dowless and his workers were also active, the apparent absentee by mail votes were as follows: Harris 259, McCready 403, and Scott 18.

29. In the 2018 General Election, Bladen CBE received 1,369 requests for absentee by mail ballots purportedly submitted by or on behalf of voters residing in the portion of Bladen County within CD-9. Some portion of these requests were fraudulently submitted under forged signatures, including a deceased voter. Bladen CBE sent absentee by mail ballots to 1,323 voters and did not send absentee by mail ballots to 46 voters for whom or by whom request forms were purportedly submitted.

30. Of the 1,323 absentee by mail ballots sent to Bladen County voters within CD-9, 728 (55.03%) were returned, and 595 (44.97%) were not returned.

31. In the 2018 General Election, the Robeson County Board of Elections ("Robeson CBE") received 2,321 requests for absentee by mail ballots purportedly submitted by or on behalf of voters in Robeson County, the entirety of which is located within CD-9. Robeson CBE sent absentee by mail ballots

11

**EXHIBIT 1**

to 2,269 voters and did not send absentee by mail ballots to 52 voters for whom or by whom request forms were purportedly submitted.

32.    Of the 2,269 absentee by mail ballots sent to Robeson County voters, 776 (34.20%) ballots were returned, and 1,493 (65.80%) were not returned.

## C.    Board Investigators found significant absentee by mail irregularities in Bladen and Robeson Counties.

33.    In April 2017, Harris personally hired McCrae Dowless to conduct an absentee ballot operation leading up to and during the 2018 elections.

34.    In June 2017, Harris hired the consulting firm Red Dome Group. Thereafter, McCrae Dowless was paid by Harris Committee through Red Dome. Red Dome would bill the Harris Committee for these expenses.

35.    Other candidates and organizations, including but not limited to Bladen County Sheriff candidate James McVicker, paid Dowless for absentee ballot operations during the 2018 elections.

36.    Dowless hired workers he paid in cash to collect absentee request forms, to collect absentee ballots, and to falsify absentee ballot witness certifications.

37.    Initially, Dowless told workers he would pay them $150.00 per 50 absentee ballot request forms collected and $125.00 per 50 absentee ballots collected, but he also sometimes paid other amounts per ballot or a flat

12

**EXHIBIT 1**

weekly rate.

38.     Dowless's absentee ballot operation was arranged into two phases: (1) the collection of absentee by mail request forms; and (2) the collection of absentee ballots.

### 1.     Phase One of Dowless's operation involved paying individuals to collect and submit absentee by mail request forms, some of which were fraudulent.

39.     In addition to using blank forms to solicit voters to request to vote absentee by mail, Dowless and his workers prepared request forms utilizing forms obtained from previous elections to "pre-fill" the form so that workers could return to those voters and have the voters sign the request form.  The pre-filled section would sometimes include voters' Social Security numbers, driver's license numbers, and dates of birth.

40.     "Phase One" of Dowless's operation was arranged into four known components. First, Dowless's workers obtained absentee by mail request forms from voters. Second, Dowless's workers returned absentee by mail request forms to Dowless for payment. Third, Dowless would photocopy and retain copies of all absentee by mail request forms for later use in subsequent elections or for other purposes. Fourth, Dowless or his workers would deliver absentee by mail request forms to the appropriate CBE Office.

41.     In the 2018 General Election, at least 788 absentee by mail request forms in Bladen County were submitted by McCrae Dowless or his workers.

EXHIBIT 1

42.     In the 2018 General Election, at least 231 absentee by mail request forms in Robeson County were submitted by McCrae Dowless's workers, though an email suggests the number may have been at least 449. The records logs maintained by Robeson CBE did not appear complete, so a correct count could not be made. In the 2018 General Election, county boards of elections were not required by law or rule to maintain logs of absentee request forms.

43.     Red Dome Group principal Andy Yates testified that Dowless called him regularly to provide updates on the number of absentee by mail requests he had collected, and that another Red Dome contractor provided Dowless lists of voters who had been sent ballots.

44.     On September 24, 2018, at 10:10:25 a.m., Andy Yates emailed Beth Harris the following:

> Of the absentees that have been sent out in Robeson so far, after reviewing them with McCrare [sic], we believe that 181 of them are from his list. They have more yet to turn into the BofE in Robeson. McCrae's team has generated a total of 449 requests in Robeson and will be generating more.

Ex. 30.

45.     Lisa Britt worked for Dowless during the 2018 General Election. She testified that Dowless's operation included efforts to "pre-fill" absentee by mail request forms based on information previously obtained and retained by Dowless, who developed the practice of saving photocopies of absentee by mail request forms that he and his workers collected during past elections.

14

**EXHIBIT 1**

Absentee by mail request forms were copied at an office used by Dowless and his workers. Copies were maintained without redactions, such that Dowless possessed sensitive voter data, including voters' Social Security numbers, driver's license numbers, dates of birth, and signatures. Lola Wooten previously worked in an absentee ballot operation distinct from the operation conducted by Dowless. However, Wooten and Dowless communicated frequently by phone during the 2018 general election and Britt, along with others, assisted and/or observed Wooten making photocopies of absentee by mail request forms brought by Wooten to Dowless's Office.

46. Because Dowless maintained photocopies of completed absentee by mail request forms from prior elections—including voters' signatures and other information used to verify the authenticity of a request—Dowless possessed the capability to submit forged absentee by mail request forms without voters' knowledge and without detection by elections officials.

47. Dowless's workers were deployed primarily in Bladen and Robeson Counties, though additional activities were carried out in other counties.

48. Dowless paid Britt and other workers based on the number of voters for whom they secured absentee by mail request forms: for every 50 request forms, the amount was between $150.00 and $175.00, plus additional money for gas and food, Britt testified. We find her testimony credible.

15

**EXHIBIT 1**

49.     Dowless would pay Britt and other workers in cash once they had submitted 50 absentee by mail request forms to him.

50.     Harris testified he was aware that Dowless paid his workers based on the number of absentee by mail request forms each worker collected and returned to Dowless. Harris explained that his Committee would pay Dowless around $4 or $4.50 per request form. Harris further testified that he had asked Dowless during their initial meeting, "'don't you pay [your workers] hourly?' [to which Dowless responded], '[n]o, if you pay people hourly down here they'll just sit under a tree." We find Harris' testimony on this issue credible.

51.     Andy Yates testified, and the Board finds it credible, that he was aware Dowless "wouldn't always turn [absentee by mail request forms] in as soon as he got them." There is substantial evidence that Dowless engaged in the practice of collecting then withholding absentee by mail request forms, submitting them to the elections office at times strategically advantageous to his ballot operation.   Dowless would track which ballots had been mailed by elections officials using publicly available data.

52.     Some portion of the absentee by mail request forms submitted by Dowless and his workers were forged. Britt admitted that she had completed the top portion of an absentee by mail request form submitted on behalf of a deceased individual, James Spurgeon Shipman. Britt denied having forged Shipman's purported signature at the bottom of the request form, which was

**EXHIBIT 1**

signed months after Shipman had died, and Britt claimed not to know who had forged Shipman's signature on the bottom of the form.

53.   Dowless and his workers engaged in a systematic effort to avoid detection of their unlawful activities.

54.   Britt forged the signature of her mother, Sandra Dowless, on a number of witness certifications on the absentee by mail container envelopes. Dowless told Britt that she had witnessed too many absentee by mail container envelopes under her signature, and Britt began forging her mother's signature.

55.   Dowless and his workers discussed and enacted strategies designed to avoid raising any "red flags" with elections officials. Dowless was aware that Britt was forging Sandra Dowless's signature at the time the forgeries occurred.

56.   During the general election, some voters discovered that absentee by mail request forms were submitted on their behalf, but without their knowledge, consent, or signature, to the Bladen CBE. At least two of these forms were submitted by Dowless employee Jessica Dowless along with other forms she was directed to deliver by Dowless.

57.   In October 2018, the State Board of Elections Office sent a mailing to every voter who had requested an absentee ballot in Bladen County for the general election. The letter informed voters of their rights and warned voters that ballot collection efforts were unlawful.   The mailing stated elections

**EXHIBIT 1**

officials would never come to a voter's home to collect their absentee by mail ballot. Of the letters sent, 184 were returned as undeliverable. It is unknown whether some portion of the 184 associated absentee by mail requests may have been fraudulent or undeliverable due to hurricane damage.

### 2. *Phase Two of Dowless's operation involved paying workers to collect absentee by mail ballots, some of which were unsealed and unvoted, and deliver then to Dowless.*

58.    Dowless and his workers sought and obtained information from local county board of elections staff to determine when individual voters had been sent absentee by mail ballots in response to their request forms, so that Dowless or his workers could return to voters' homes shortly after absentee by mail ballots were received.

59.    Some absentee by mail ballots unlawfully collected by Dowless and his workers were not properly witnessed by two witnesses or a notary public. Dowless's workers would sign the witness certification when they had not witnessed the voter mark his or her ballot in their presence.

60.    Dowless and his workers collected at least some of the absentee by mail ballots unsealed and unvoted.

61.    After Dowless's workers collected absentee by mail ballots from voters, they would deliver the absentee by mail ballots to Dowless in order to collect their payment in cash.

**EXHIBIT 1**

62.    Dowless frequently instructed his workers to falsely sign absentee by mail ballot container envelopes as witnesses, even though they had not witnessed the voter mark the ballot in their presence.   During the 2018 General Election, the Witness' Certification section printed on the absentee return envelope reads as follows:

> I certify that: • I am at least 18 years old • I am not disqualified from witnessing the ballot as described in the WARNING on the flap of this envelope • The Voter marked the enclosed ballot in my presence, or caused it to be marked in the Voter's presence according to his/her instruction • The Voter signed this Absentee Application and Certificate, or caused it to be signed • I respected the secrecy of the ballot and the Voter's privacy, unless I assisted the Voter at his/her request

The following was printed on the flap of the absentee ballot envelope in the 2018 General election: "Fraudulently or Falsely completing this form is a Class I felony under Chapter 163 of the N.C. General Statutes."

63.    In some cases, Dowless's workers fraudulently voted blank or incomplete absentee by mail ballots at Dowless's home or in his office. Kimberly Robinson testified that she turned over her unmarked ballot to Lisa Britt and Ginger Eason, workers paid by Dowless.   We find her testimony credible.

64.    In some cases, ballots that had been collected unsealed and unvoted were returned to the county board of elections bearing fraudulent witness signatures and were accepted and counted.

**EXHIBIT 1**

65.     Dowless and his workers engaged in various practices to avoid detection by election officials. Those practices included: (1) delivering small batches of ballots to the post office; (2) ensuring that ballots were mailed from a post office that was geographically close to where the voter lived; (3) ensuring that witnesses signed and dated absentee by mail container envelopes with the same date as the voter; (4) ensuring that witnesses signed in the same color ink as the voter, which included tracing over existing signatures to ensure conformity; (5) ensuring that stamps were not placed in such a way as to raise a red flag for local elections administrators; (6) taking some collected ballots back to the voter for hand-delivery to the local Board of Elections; and (7) limiting the number of times a witness's signature appeared on the ballot; and (8) forging witness signatures on ballot envelopes.

66.     From past experience, Dowless considered certain practices to be "red flags" that could trigger suspicion by elections officials.  Dowless was careful to keep an arms' length distance from certain actions he directed his workers to do, such as falsely witnessing ballots, filling out ballots, and tracing over signatures of witnesses to match the ink color of the voter.  Dowless had publicly made false statements to conceal his ballot collection activities by denying he "ever touched a ballot" or instructed any of his workers to collect. Ex. 35.  Both Mark Harris and Andy Yates testified that Dowless specifically told that neither he nor his workers ever collected ballots.  Lisa Britt and Kelly

20

**EXHIBIT 1**

Hendrix both testified that ballot collection was a part of Phase Two as directed by Dowless.

67. Lisa Britt testified, and we find it credible, that Dowless once scolded her for placing stamps on absentee by mail container envelopes in an idiosyncratic way that might alert local elections officials to Dowless's unlawful operation (i.e. affixing the stamp upside-down). Britt understood Dowless's warning to mean that placing the stamps in a particular way might alert elections officials that someone was unlawfully handling and mailing absentee by mail ballots on behalf of voters.

68. In order to avoid detection of Dowless's operation, Britt and Dowless's other workers would sign the witness certifications on absentee by mail container envelopes using the same color ink that the voter had used, and copying the same date that appeared next to the voter's signature, even if the witness certification was completed on some other date. Britt testified, and we find it credible, that the strategy was instituted to "throw off the elections board." At times when a certification was signed in a different color ink than the voter's, Dowless's workers would, at his direction, trace over the witness signature and date using ink similar in color to the ink used by the voter.

69. Britt explained the ballot collection and witnessing process as follows. If a voter did not have the witnesses for the ballot, the workers would take the ballots back to Dowless. They were paid to collect the ballots, but

21

**EXHIBIT 1**

were not paid as much for collecting ballots as for request forms.

70.     Britt testified regarding her payment arrangement with Dowless for the collection of absentee by mail ballots.  She said she believed they had been paid $125 for 50 ballots, and that she worked about two or three weeks picking up ballots at that rate.  Once they realized it was harder to convince voters to turn over their absentee by mail ballots than request forms, they were just paid a flat weekly rate of about $200 per week. We find her testimony credible.

71.     Ginger Eason and Cheryl Kinlaw similarly admitted in videotaped interviews that they were paid by Dowless to push votes for Harris, and to return collected ballots to Dowless, who had stacks of ballots on his desk throughout the 2018 General Election. Exs. 103, 104.

72.     Britt testified the workers were sent back out to voters' homes once their ballots came back in the mail, to explain to the voters, that if the ballot wasn't correctly witnessed by two voters that the board of elections would reject and the vote would not count. If the voter had two witnesses available when she arrived, the voter would use his or her two witnesses. But in the event that they didn't have someone available to witness their signature on the ballot container envelope, the workers would explain to the voter they could witness it for the voter, or have it witnessed and mail it for the voter.  We find her testimony credible.

**EXHIBIT 1**

73.     Britt claimed that she did not fill in or vote any of the absentee by mail ballots that she personally collected, but she admitted, and we find, that she had filled in races on ballots that were collected by Dowless's other workers.

74.     Affected voter Kimberly Robinson's testimony corroborated Britt's admission that Dowless and his associates had collected unsealed and unvoted absentee by mail ballots. Robinson testified that, after she received an absentee by mail ballot in the mail in the fall of 2018, Britt and Ginger Eason came to her home in a van and took her unsealed, unvoted ballot. Robinson explained that she signed the ballot container envelope, and that Ginger Eason signed the ballot container envelope as a witness in front of her, but that no one signed as the second witness. Robinson explained that she gave Britt and Eason her blank absentee by mail ballot because "McCrae usually helped me out," by voting her ballot, since she "didn't know who to vote for" or "much about politics." We find her testimony credible.

75.     Multiple affiants and other witnesses similarly reported that Dowless and his associates collected or attempted to collect absentee by mail ballots, including unsealed and/or unvoted ballots. *See* Ex. 107 (C. Eason Aff.); Ex. 10 (D. Montgomery Aff.); Ex. 8 (E. Shipman Aff.); Ex. 9 (E. Shipman Suppl. Aff.); Ex. 84 (press reports of statements by affected voters Kirby Wright and Doris Hammonds).

**EXHIBIT 1**

76.    We find that Dowless and his workers collected absentee ballots in violation of North Carolina law.

77.    We find that Dowless and/or his workers marked the ballots of other individuals in violation of North Carolina and federal law.

78.    Other absentee by mail ballots voted in the General Election were otherwise unlawful. For example, Lisa Britt, who testified that she currently is and was at all relevant times on probation for a felony offense involving the sale of "pills" and was therefore ineligible to vote, voted in the November 2018 General Election. Britt claimed that Dowless told her that, because her probation was not out of Bladen County, that she was still eligible to vote in Bladen County.

79.    Dowless appeared at the evidentiary hearing on this matter but refused to testify when called as a witness by the State Board's staff. Through counsel, Dowless stated that he would not testify unless granted immunity in the manner allowed under Chapter 163. The State Board declined to grant immunity, and Dowless did not testify. As provided in its Amended Order of Proceedings, the State Board may draw, and does now draw, an adverse inference from Dowless's refusal to testify or to be interviewed by the State Board's investigators throughout the duration of its investigation. Dowless's refusal to testify supports our findings otherwise supported by other testimony heard by Dowless on February 18, 2019, including that Dowless or those

24

**EXHIBIT 1**

working at his direction engaged in unlawful activities during the 2018 General Election, including witness tampering and intimidation, absentee ballot harvesting, forgery, and a scheme to obstruct the conduct of the 2018 General Election.

### D. Harris personally hired McCrae Dowless to conduct an absentee ballot operation leading up to and during the 2018 elections.

80.     Prior to hiring Dowless to work for his 2018 campaign, Mark Harris was aware of the absentee by mail voting results in Bladen County in the 2016 Republican Primary Election. In Bladen County during the 2016 Republican Primary Election, Todd Johnson received 221 absentee by mail votes, Mark Harris received 4 absentee by mail votes, and incumbent Robert Pittenger received 1 absentee by mail vote.

81.     In an email bearing the subject line "Anomalous Voting in Bladen County" sent to Mark Harris and Beth Harris on June 7, 2016, John Harris, their son, explained why the available data from the 2016 Republican Primary led him to conclude that "absentee by mail votes look very strange." *See* Ex. 53. John Harris's email pointed out to Mark Harris and Beth Harris three anomalies in Bladen absentee mail voting. First, Todd Johnson received a significantly disproportionate share of absentee by mail votes in comparison to Johnson's share of one-stop and Election Day votes. Second, Bladen County featured an unusually high number of absentee by mail votes overall—

**EXHIBIT 1**

approximately 22% of all absentee by mail votes cast in CD-9, compared to only 2% of Election Day and one-stop votes cast in CD-9. Third, there was a disproportionately large share of African American voters among Bladen County absentee by mail voters relative to other counties. *See id.*

82.     In an interview conducted after the Board had declined to certify the CD-9 election, Mark Harris stated that he learned that Dowless conducted Todd Johnson's absentee mail ballot program in Bladen County a couple weeks after the June 6, 2016 Republican primary election from a friend, Judge Marion Warren. Harris stated that according to Judge Warren, "McCrae was a guy from Bladen County. He was a good old boy that knew Bladen County politics, that he, you know, did things right, and that he knew election law as better -- better than just about anybody he knew of." Ex. 38, Tr. 3:7-3:11.

83.     On March 8, 2017, Mark Harris sent a text message to former Judge Marion Warren. The text message followed up on a previous conversation regarding a proposed trip to Bladen County during which Judge Warren would connect Mark Harris to the key people that could help him carry that part of the county in a future U.S. House CD-9 race. Mark Harris specifically referenced McCrae Dowless in this text message, describing him as "the guy whose absentee ballot project for Johnson could have put me in the U.S. House this term, had I known, and he had been helping us." Ex. 61.

84.     On April 6, 2017, Mark Harris met Dowless at Bladen County

**EXHIBIT 1**

Commissioner Ray Britt's furniture store in Bladen County and discussed Dowless's absentee ballot program.

85.     Prior to hiring Dowless, Mark Harris was warned by his son that Dowless may have engaged in the unlawful collection of ballots during the 2016 Republican primary election.

86.     On April 6, 2017 or April 7, 2017, Mark Harris and Beth Harris spoke with John Harris over the telephone about Dowless's absentee ballot program, at which time John Harris stated his concerns about Dowless to Mark Harris, including that Dowless had engaged in collecting ballots in 2016 and John Harris testified that his general sense that Dowless was "kind of a shady character." John Harris also reminded Mark Harris about the analysis that John Harris had set forth in his June 7, 2016, email regarding absentee ballot results for Johnson in Bladen County in 2016, including that ballots had popped up in "batches," strongly suggesting that Dowless and his affiliates were collecting bundles of ballots and mailing them *en masse*.

87.     John Harris testified that McCrae Dowless told Mark Harris that he never touched absentee ballots, but that John Harris did not believe Dowless because the numbers did not add up and relayed this information to Mark Harris during the April 6, 2017 or April 7, 2017 phone call. We find this testimony credible.

**EXHIBIT 1**

88.     On April 7, 2017, John Harris, Mark Harris and Beth Harris exchanged a series of emails following the April 6, 2017 or April 7, 2017 phone call between the three regarding Dowless. In those emails, John Harris specifically informed Mark Harris and Beth Harris that he was "fairly certain" Dowless's operation was involved in illegal activities, namely "that they collect the completed absentee ballots and mail them all at once." John Harris provided the text of and citation to the relevant North Carolina law that makes such practice illegal. Ex. 55. John Harris's conclusion was based, at least in part, on evidence in public voting data showing that ballots had been returned in batches to the Bladen County Board of Elections office, leading John Harris to believe that Dowless and his affiliates had been mailing stacks of ballots at a time. *See id*.

89.     Mark Harris was aware that Dowless had a prior criminal conviction before he hired Dowless.  He denied knowledge of any convictions related to perjury or fraud.

90.     Mark Harris hired Dowless on or around April 20, 2017.

91.     John Harris provided credible testimony that Dowless offered his father, Mark Harris, the choice between "a gold plan, a bronze plan, and a silver plan," with the different plans being tethered to the amount of people that Dowless would be able to employ or put "on the ground."

**EXHIBIT 1**

92.     On April 20, 2017, Mark Harris wrote a check for $450.00, drawn on Harris's personal checking account, and made payable to the terminated North Carolina independent expenditure political committee Patriots for Progress. Ex. 60. Mark Harris testified that Dowless directed him to write a check to Patriots for Progress in order to retain Dowless's services. We find his testimony on this issue credible.

93.     On May 4, 2017, Mark Harris wrote a second check for $2,890.00, drawn on Harris's personal checking account, and made payable to Patriots for Progress. *See* Ex. 60. Mark Harris testified that the second check to Patriots for Progress was to fund start-up costs for Dowless's operation, including workers and office space. We find his testimony on this issue credible.

E.     **Dowless's Operation was Well-Funded. The Harris Committee Funded Dowless's Operation Through Payments to Red Dome.**

94.     Andy Yates testified that he and Red Dome officially started with the Harris Committee at the beginning of July 2017, but that Dowless had already been hired by the Harris campaign began earlier in 2017 in that Harris and Dowless had already agreed upon Dowless's fees. We find this testimony credible.

95.     Beginning in July 2017, all fees and payments to Dowless were made through Red Dome.

**EXHIBIT 1**

96.     During both the primary and the general election, Red Dome submitted invoices to the Harris Committee and was reimbursed for payments made to Dowless.

97.     All members of the Harris Committee's staff, except for Mark and Beth Harris, were paid by the Harris Committee through Red Dome.

98.     In total, the Harris Committee paid Red Dome $525,088.95 between August 1, 2017, and November 26, 2018. Ex. 142.

99.     For the 2018 General Election, the Harris Committee paid Red Dome $289,980.50 between May 3, 2018, and November 26, 2018. *See id.*

100.    Andy Yates testified, and we find it credible, that as of the date of his testimony, the Harris Committee still had outstanding invoices from Red Dome that were unpaid or partially unpaid, which totaled approximately $51,515.50. *See* Ex. 28 at 24 (Yates testified that $11,000 was still owed on this partially paid invoice); *id.* at 27 ($7,881.50); *id.* at 28 ($32,634.00).

101.    In total, Red Dome paid Dowless $131,375.57 between July 3, 2017, and November 7, 2018. *See* Board's Preview of Evidence at slide 15.

102.    For the 2018 General Election, Red Dome paid Dowless $83,693.57 between June 8, 2018, and November 7, 2018. *Id.*

103.    Approximately $15,000 of the $131,375.57 that was paid to Dowless by Red Dome was for work performed by Dowless for other clients of Red Dome.

**EXHIBIT 1**

104.   Yates testified the Harris Committee paid Dowless a flat fee of $1,625 per month for the general election, plus additional sums to fund payments made to Dowless's workers and other expenses Dowless incurred on behalf of the Harris Committee.  This was an increase from the $1200 per month that the Harris Committee paid Dowless for the primary election.  The total sum paid by the Harris Camapign to Dowless exceeded the sum paid to other significant individuals, including the campaign manager.

105.   Additional sums paid to Dowless were based on verbal representations made by Dowless of his expenses.

106.   Red Dome and the Harris Committee relied on Dowless's representations of his expenses and took Dowless's verbal representations at face value.

107.   Andy Yates testified that no documentation was required of Dowless for payment of his expenses or for proof of activities regarding his absentee ballot program, and no documents were sent or received by Red Dome to verify Dowless's activity.

108.   In addition to the absentee ballot activities already described, Dowless paid individuals to put out and take up yard signs and to work at local festivals and parades. He also paid individuals to work the polls in Bladen, Robeson and Cumberland Counties during early voting, on the day of the primary, and on the day of the general election. An unknown portion of the

**EXHIBIT 1**

payments from Red Dome to Dowless funded this activity. Red Dome also paid and/or reimbursed Dowless for the cost of office space, as well as associated costs for utilities, internet, office supplies, office staff and paper copies or office copier expenses.

109.   John Harris testified that he spoke with Andy Yates about general concerns that John Harris had about Mark Harris's decision to hire Dowless, including that Dowless was a "shady character." John Harris also testified that he did not describe his concerns regarding Dowless to Yates in as stark of terms as he had described his concerns about Dowless to Mark Harris. We find his testimony credible.

110.  Andy Yates was aware that Dowless had a prior criminal conviction before he began making payments to Dowless.  He denied knowledge of any convictions related to perjury or fraud.

111.   Between July 3, 2017, and November 7, 2018, Bladen County Sheriff Jim McVicker paid Dowless $5,000 for what is alleged to have been get-out-the-vote activity. *See* Board's Preview of Evidence at slide 16.

112.   The McVicker Committee also contracted with Red Dome for services related to phone services, robocalls, and ring-less voicemail. In total, McVicker paid Red Dome a total of $8,000 in the 2018 election cycle.

**EXHIBIT 1**

**F.     The Harris Committee failed to comply fully with subpoenas lawfully issued by this State Board and its predecessor.**

113.   The Harris Committee failed to comply fully with subpoenas issued by the State Board of Elections and Ethics Enforcement on December 1, 2018, and identical subpoenas by the State Board of Elections on February 6, 2019, despite repeated invitations to supplement its production.

114.   Each subpoena was identical in scope, and required production of "emails, text messages" and other records in the possession of the Harris Committee regarding absentee voting efforts and Dowless, among other items. The covered period ran from January 2016 through December 1, 2018.

115.   On December 4, 2018, agency counsel assisted the Harris Committee, at the Committee's request, by suggesting preliminary search terms, but counsel "emphasized . . . that the initial list of search terms would not, and could not, limit the scope of the subpoena." Ex. 56.

116.   The Harris Committee, through counsel, initially produced certain records running from July 2017 forward. On January 15, 2019, agency counsel transmitted correspondence challenging the legal basis on which the Harris Committee refused to produce records dated before July 2017. *Id*.   On February 8, 2019, the Harris Committee supplemented its production with additional responsive records that predated July 2017.

117.   On February 17, 2019, agency counsel requested written

33

**EXHIBIT 1**

confirmation that the Committee had "provided any documents related to absentee ballot activity, Dowless, or planning related to future absentee ballot activities, dated on or after March 1, 2017," and cited the subpoena.  *Id*.  The Harris Committee, through its counsel John Branch, confirmed the same:

> [T]his will confirm that we produced all responsive, non-objectionable (per the attorney-client privilege, the attorney work product doctrine, or the spousal privilege) documents related to absentee ballot activity, Dowless, or planning related to future absentee ballot activities from March 1, 2017 to December 1, 2018 which we found using the agreed-to methods of searching for the documents (i.e. the State Board's queries) and the quality control efforts we undertook to make sure, to the best extent we reasonably could, that all responsive documents were found.

*Id*.

118.   At no time before the evidentiary hearing, however, did the Committee produce responsive communications between John Harris and Mark Harris regarding the nature and legality of Dowless's operation (Exs. 54 and 55) or communications between Mark Harris and Judge Marion Warren in which Harris sought to secure a connection to "the guy whose absentee ballot project . . . could have put me in the US House this term, had I known, and he had been helping us" (Ex. 61).   Indeed, the Committee only attempted to supplement its production to include communications with John Harris after it became clear that John would testify, and mere minutes before the State called John as its witness.

119.   Late in the evening after John Harris testified, the Committee supplemented its production with more than 800 pages, including

**EXHIBIT 1**

communications with Judge Warren (Ex. 61).

120.   Among other reasons cited for the Committee's failure to make a complete production, counsel John Branch indicates that the Committee had operated under a mistaken understanding of its obligations under the subpoenas.  We find the explanation unpersuasive, as the productions were clearly responsive. The Harris Committee failed to comply fully with the lawful subpoenas by this Board, and that such non-compliance contributes to cumulative doubt cast on the congressional election.

121.   This Board cannot allow parties or their counsel to behave in this manner, and the Board will take further action as it deems appropriate separate from this Order.

## G.   Expert Findings

122.   Dr. Stephen Ansolabehere, a professor of Government at Harvard University, explained in his report that patterns of absentee by mail voting in the 2018 General Election in Bladen and Robeson Counties differed significantly from the remainder of CD-9 and from elsewhere in the State. *See* Ex. 73. We find this information credible.

123.   Dr. Michael Herron, a professor of Government at Dartmouth University, explained in his report that Harris's mail-in absentee support in Bladen County was greater than the absentee by mail support for any other comparable Congressional candidate in any general election since 2012 in

**EXHIBIT 1**

both North Carolina and three comparable states. *See* Ex. 74 at 26-28, 27 t.8. We find this information credible.

124.   We find Dr. Stephen Ansolabehere credible in his conclusion that the rates at which voters who requested absentee by mail ballots in Bladen and Robeson counties but did not return their absentee ballots are statistical outliers compared to CD-9 and the rest of the state. Elsewhere in CD-9, of voters who requested an absentee ballot, 10% did not vote at all. But in Bladen County, 337 voters requested an absentee ballot but did not vote at all (approximately 26% of people who requested absentee ballots). In Robeson County, 832 voters requested an absentee ballot but did not vote at all (approximately 36% of people who requested absentee ballots). These were the two highest rates of nonvoting in both CD9 and the state as a whole. *See* Ex. 73, at 63.

125.   We also find Dr. Stephen Ansolabehere credible in his conclusion that both frequent voters and occasional voters in Bladen and Robeson had much higher non-return rates than similar voters elsewhere in the state. Elsewhere in CD-9, 9.7% of frequent voters (i.e. voters who voted in more than four of the last six elections) did not return their absentee ballots or otherwise vote. Elsewhere in CD-9, brand new voters who requested an absentee ballot are a little bit less likely to vote than experienced voters: about 14%. However, in Bladen and Robeson Counties in CD-9, 41.7% of frequent voters did not

**EXHIBIT 1**

return their absentee ballots or otherwise vote. A similarly high proportion of new voters (48%) did not return their absentee ballots or otherwise vote. Ex. 73, at 67, 67 t.7. We find this information credible.

## H. Dowless Engaged in Efforts to Obstruct the Board's Investigation and Tamper with Witnesses.

126.   Efforts were made to obstruct the Board's investigation and the testimony to be provided at the hearing.

127.   Lisa Britt testified that Dowless blindsided her with a videotaped interview with WBTV reporter Nick Ochsner, which was first aired on or around December 12, 2018. Britt claimed that when she arrived at Dowless's house after work one afternoon, Dowless told her that a friend of his that he had spoken with a few times was coming to take a videotaped statement from Britt regarding the allegations that Dowless and his workers had been collecting ballots. Britt testified that what she said in that interview with Ochsner was not truthful, and it was revealed during the hearing that Britt had previously provided contradictory statements to Board Investigator, Joan Fleming, by the time the interview was filmed. We find her testimony credible.

128.   Lisa Britt further testified that on or around February 14, 2019, just one week before the hearing, Dowless asked her to come to his residence where he provided her a slip of paper coaching her on how she should testify

37

EXHIBIT 1

at the hearing.  Britt took a picture of the slip of paper and provided that picture by text to Board Investigator, Joan Fleming. That text message, which was moved into evidence, reads:

> I can tell you that I haven't done anything wrong in the election and McCrae Dowless has never told me to do anything wrong, and to my knowledge he has never done anything wrong, but I am taking the 5th Amendment because I don't have an attorney and I feel like you will try to trip me up. I am taking the 5th.

Ex. 7. We find her testimony credible, and Britt later produced the original copy of the slip of paper.

129.   Britt testified that there was also a meeting at Dowless's house sometime after reports began circulating that Dowless was involved in the absentee by mail irregularities in CD-9, and after the Board declined to certify the results of the CD-9 race, during which Dowless told a group of his workers, including Britt, that, "as long as we stick together, we will be fine." We find Britt's testimony credible. At the same meeting, Dowless stated that there were no films or videos of their activities.

## I.  Bladen County Early Voting Results Were Improperly Tabulated on November 3, 2018

130.   Bladen County one-stop early voting results were improperly and unlawfully tabulated at 1:44 p.m. on November 3, 2018. *See* Ex. 18.

131.   The physical tape that was printed when early voting results were tabulated displayed early voting results for United States House District 9,

**EXHIBIT 1**

Bladen County Commissioner District 3 and Bladen Soil and Water Conservation District Supervisor. *See* Ex. 18.

132.   Early voting judges Michele Maultsby, Coy Mitchell Edwards and Agnes Willis signed the tape on November 3, 2018. *See* Ex. 18.

133.   Michele Maultsby, Coy Mitchell Edwards and Agnes Willis testified that they were unaware that it is unlawful to tabulate early voting results before Election Day, stating that they had been incorrectly trained to always tabulate results at the end of early voting. We find their testimony credible.

134.   Coy Mitchell Edwards and Agnes Willis viewed early voting results for Bladen County Sheriff on November 3, 2018.

135.   At least four other first shift poll workers were present at the one-stop site when results were tabulated and had access to early voting results for United States House District 9, Bladen County Commissioner District 3 and Bladen Soil and Water Conservation District Supervisor. *See* Ex. 19

136.   Testimony at hearing described a meeting held between the early voting worker, Agnes Willis, and the director of elections in Bladen CBE, Cynthia Shaw, in which Director Shaw inquired how the early voting results had gotten out into the community. Testimony indicated that the conversation occurred when the early voting worker returned the early voting equipment to the Bladen CBE office shortly after early voting ended

**EXHIBIT 1**

on Saturday, November 3, 2019.

137.   During the last day of one-stop early voting in the 2018 Primary Election, and before early voting results could be lawfully tabulated, Dowless represented that Harris had "988 of the votes in Bladen." Ex. 70.  The final sum of absentee by mail votes and one-stop votes canvassed by the Bladen CBE was 889 votes for Harris.

**J.     Bladen County Board of Elections Office Security Concerns**

138.   The Bladen County Board of Elections shares office space with the Bladen County Veterans Affairs Administration. Non-elections personnel had access to Board of Elections office space. Ex. 65.

139.   The room in the Bladen County Board of Elections office where the results tabulation computer is located is directly across a common hallway from an office occupied by Veterans Affairs staff. *See* Ex. 65.

140.   A photo taken by a county board member and sent to investigators on November 6, 2018, shows that the key to the ballot room, which is labeled with a keychain marked "Ballot Rm," hung on a wall in an area of the Board of Elections Office accessible to non-elections personnel. The photo was sent by text message with the message: "Same spot they have always been." Ex. 63.

141.   Another picture of those same keys, which was taken by a Board investigator on November 29, 2018, shows the keys hung on the same wall Ex. 64.

**EXHIBIT 1**

142.   A photo taken by Board investigators shows the ballot room left open, with the keys to the room left unattended in the door. Ex. 66.

143.   The Bladen County Board of Elections unanimously voted to update security by resolution passed on June 12, 2018, but the Board's request for funding was inexplicably denied by the Bladen County Board of Commissioners and no updates were made. *See* Ex. 68.

144.   In October of 2018 the United States Department of Homeland Security conducted a review of the physical security at the Bladen County Board of Elections office in 2018 and provided a list of options to mitigate existing vulnerabilities, increase resilience and implement protective measures. *See* Ex. 67.

**K.   Fraud, improprieties, and irregularities occurred to such an extent that they taint the results and cast doubt on the fairness of contests held for Congressional District 9, Bladen Soil and Water Conservation District Supervisor, and Bladen County Commissioner, District 3 in the 2018 General Election.**

145.   The fraud, improprieties, and irregularities identified in Paragraphs 1 through 144, *supra*, operate cumulatively under the unique circumstances of this case to taint the results and cast doubt on the fairness of contests held for Congressional District 9, Bladen Soil and Water Conservation District Supervisor, and Bladen County Commissioner, District 3 in the 2018 General Election.

**EXHIBIT 1**

146.    Indeed, Harris himself testified as follows near the conclusion of the State Board's evidentiary hearing on this matter:

> Through the testimony I have listened to over the past three days, I believe a new election should be called. It has become clear to me that the public's confidence in the Ninth District seat [in the] general election has been undermined to an extent that a new election is warranted.

We find his assessment of public confidence credible.

### III.   CONCLUSIONS OF LAW

147.    Sufficient notice of the evidentiary hearing and of other procedural rights was provided to all candidates who competed for election to the U.S. Representative for North Carolina's Ninth Congressional District; Seat 2 on the District Court in Judicial District 16B; Bladen County Commissioner District 3; and the Bladen Soil and Water Conservation District Supervisor. All candidates were afforded due process and the opportunity to present and cross-examine witnesses at the evidentiary hearing.

148.    The State Board has general supervisory authority over the primaries and elections in the State and the authority to promulgate reasonable rules and regulations for the conduct of such primaries and elections as it may deem advisable. G.S. § 163A-741(a). This includes the authority to "investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county municipality

**EXHIBIT 1**

or special district." G.S. § 163A-741(d).

149. The State Board has the authority to "initiate and consider complaints on its own motion" and "take any other action necessary to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election." G.S. § 163A-1180.

150. That authority includes the power to order a new election when: (1) ineligible voters sufficient in number to change the outcome of the election were allowed to vote in the election, and it is not possible from examination of the official ballots to determine how those ineligible voters voted and to correct the totals; (2) eligible voters sufficient in number to change the outcome of the election were improperly prevented from voting; (3) other irregularities affected a sufficient number of votes to change the outcome of the election; or (4) irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness. G.S. § 163A-1181(a).

151. The findings of fact set forth above reflect numerous irregularities that occurred in the November 6, 2018, general election in Bladen and Robeson Counties, and many of those irregularities occurred as a result of a coordinated, unlawful, and well-funded absentee ballot scheme operated by McCrae Dowless on behalf of Mark Harris. The scheme perpetrated fraud and

43

EXHIBIT 1

corruption upon the election and denied the voters in affected contests "the opportunity to participate in a free and fair election . . . the purity and validity of said election being suspect and doubtful." *See Appeal of Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 569 (1980) (hereinafter *Clay County*) (affirming State Board's order of a new election after absentee ballots were illegally collected, certain ballots showed evidence of having not been sealed, vote buying occurred, and other administrative misconduct occurred).

152.   It is neither required nor possible for the State Board to determine the precise number of ballots affected in circumstances such as this. *See Clay County*, 45 N.C. App. at 573 (holding that the State Board would have been "derelict" had it failed to call for a new election when there was no showing that the violations that occurred were sufficient to change the outcome of the election but "a cloud of suspicion ha[d] been cast on all the absentee ballots cast in the election").

153.   As set out in the Findings of Fact, and in light of the unique circumstances set forth therein, including the pervasive, wrongful, and fraudulent scheme undertaken by Dowless and his workers on behalf of Mark Harris and the Harris Committee, this Board concludes unanimously that irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness.

**EXHIBIT 1**

**It is, therefore, ORDERED:**

A new election shall be conducted in Congressional District 9 under the following schedule:

a.  Primary election: May 14, 2019;

b.  Second primary (if necessary): September 10, 2019;

c.  General election (if no second primary): September 10, 2019; and

d.  General election (if second primary): November 5, 2019.

And a new general election for Bladen Soil and Water Conservation District Supervisor and for Bladen County Commissioner, District 3, shall be held on May 14, 2019 as indicated above.

This the 13th day of March, 2019.

Robert B. Cordle
Chair

EXHIBIT 1

<u>CERTIFICATE</u>

I, Josh Lawson, general counsel to the North Carolina State Board of Elections, do hereby certify that agency staff posted the foregoing document(s) in the manner directed by Paragraph 6 of the Amended Order of Proceedings issued February 4, 2019, and by Federal Express delivery to the parties indicated below:

[https://dl.ncsbe.gov/index.html?prefix=State_Board_Meeting_Docs/Congressional_District_9_Portal/](https://dl.ncsbe.gov/index.html?prefix=State_Board_Meeting_Docs/Congressional_District_9_Portal/)

Dan K. McCready
Candidate, U.S. House (2018)
   c/o Marc Elias
     Jonathan Berkon
     700 13th Street, NW, Suite 600
     Washington, D.C.  20005

     John Wallace
     3737 Glenwood Ave.
     Suite 260
     Raleigh, NC 27612

Mark E. Harris
Candidate, U.S. House (2018)
   c/o David Freedman
     860 West Fifth Street
     Winston-Salem, NC 27101

     Alex Dale
     127 Racine Drive
     Wilmington, NC 28403

     John Branch
     128 E. Hargett Street, Third Floor
     Raleigh, NC  27601

Jeff Scott
Candidate, U.S. House (2018)
1300 Blueberry Ln.
Charlotte, NC 28226

Russell Priest
Candidate, Bladen Board of Commissioners
307 Keith Ave.
Elizabethtown, NC  28337

Earl Storms
Candidate, Bladen Soil & Water
405 Storms Rd.
Bladenboro, NC 28320

Wayne Edge
Candidate, Bladen Board of Commissioners
2202 First Ave.
Elizabethtown, NC  28337

Tim Gause
Candidate, Bladen Soil & Water
137 Marvin Hammond Dr.
Bladenboro, NC 28320

Charles Wendell Gillespie
Candidate, Bladen Soil & Water
874 Dewitt Gooden Rd.
Elizabethtown, NC  28337

This the 13th day of March, 2019.

Josh Lawson,
General Counsel
N.C. State Board of Elections